IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CV-509-FL

| | |
|---|---|
| CHANCELOR JOHNSON ) | |
| ) | |
| Plaintiff/Claimant, ) | |
| ) | |
| ) | **MEMORANDUM AND** |
| v. ) | **RECOMMENDATION** |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-24, DE-27] pursuant to Fed. R. Civ. P. 12(c). Claimant Chancelor Johnson ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of his application for a period of disability and Disability Insurance Benefits ("DIB"). The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be denied, Defendant's Motion for Judgment on the Pleadings be allowed, and the final decision of the Commissioner be upheld.

## I. STATEMENT OF THE CASE

Claimant filed an application for a period of disability and DIB on March 31, 2010, alleging disability beginning March 11, 2010. (R. 14, 65, 143-49). The claim was denied initially (R. 14, 58-65, 80-83) and upon reconsideration (R. 14, 66-79, 85-88). A hearing before Administrative Law Judge James Myles ("ALJ") was held on October 11, 2011, at which Claimant, represented by counsel, and a vocational expert ("VE") appeared and testified. (R. 31-57). On December 9, 2011,

the ALJ issued a decision denying Claimant's request for benefits. (R. 11-30). On May 15, 2013, the Appeals Council denied Claimant's request for review. (R. 1-6). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

2

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process, as set forth in 20 C.F.R. § 404.1520, under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

In this case, Claimant alleges the following errors by the ALJ: (1) failure to classify Claimant's knee condition as a "severe" impairment, (2) failure to properly evaluate Claimant's 20% Veteran Affairs ("VA") disability rating for his knee impairment, and (3) improper assessment of Claimant's credibility. Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") [DE-25] at 4-6.

3

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. (R. 25-26). At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 16). Next, the ALJ determined Claimant had the severe impairment of a back injury. *Id.* The ALJ also found Claimant had a non-severe impairment of depression. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17). Applying the techniques prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild restrictions in his activities of daily living, social functioning, and concentration, persistence or pace with no episodes of decompensation. (R. 16).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to "lift and carry up to 50 pounds occasionally and up to 25 pounds frequently, with no forceful pushing or pulling with the upper extremities." (R. 17). The ALJ also limited Claimant to "performance of simple, routine, repetitive tasks that are routine in nature with occasional interpersonal contact." *Id.* In making this assessment, the ALJ found Claimant's statements about his limitations not fully credible. (R. 21). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of his past relevant work as a merchandiser, truck driver, forklift operator, and night supervisor. (R. 24, 48-49). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the

4

national economy. (R. 24-25).

**B.      Claimant's Testimony at the Administrative Hearing**

At the time of Claimant's administrative hearing, Claimant was 58 years old, unemployed, and living with his adult daughter. (R. 36, 38). Claimant is a high school graduate with some college course work. (R. 36). Claimant was last employed with Healy Wholesale Company[1] for approximately four years, where his duties included merchandising and truck driving. (R. 39, 48-49, 165-166, 186). Product merchandisers deliver the product and also set up displays in individual stores. (R. 39). On average, Claimant was lifting pallets of product ranging from 15 to 40 pounds. *Id.* Claimant's past work experience also includes forklift operation, truck driving, and supervising. (R. 48-49, 186).

Claimant explained numerous medical conditions supporting his disability claim and his inability to work full-time. These medical conditions include problems with his back and left leg giving out and arthritis in his arms. (R. 36-37). Claimant testified that he is unable to work due to his back and left leg giving out and the pain associated with his back, arms, and left leg. *Id.* Claimant takes pain medication and anti-inflammatory medication for the pain in his back and his arthritis. (R. 37). Claimant did have some physical therapy at the VA in the past, but does not currently attend physical therapy. *Id.* Claimant testified that the physical therapy helped with his pain. *Id.*

At the time Claimant hurt his back, Claimant was holding product in his arms at chest-height. (R. 41). As Claimant was taking the product forward, he slipped and felt a warm sensation. *Id.*

---

[1] At the hearing, the VE mistakenly identified Claimant's most recent employer as Sullivan Wholesale Company. (R. 48).

5

Claimant testified that he drove to his next stop but could not get out of his truck because of the back pain. *Id.* Since his accident, Claimant experiences pain in his back on a regular basis. *Id.* Claimant describes the pain as "like needles" and notes that it comes and goes. *Id.* Claimant's medications help control his pain, and he does not experience any side effects from them. *Id.* Claimant is unable to fully bend over or to stoop down because of his back pain. *Id.* Claimant has to prop up his feet in order to tie his shoes. (R. 42). Claimant's back pain radiates down into his thighs, particularly in his left leg. *Id.* When this happens, Claimant experiences about five minutes of constant pain. *Id.* When Claimant is sitting, he experiences constant tingling and numbness in the bottom of his feet. *Id.*

Claimant wears a knee brace as a result of his left knee pain. (R. 42-44). Claimant's VA doctor prescribed the knee brace after an operation aimed at treating Claimant's knee pain. (R. 43). Claimant wears the knee brace at least four days a week. *Id.* The knee brace helps Claimant balance when he feels like his left knee is about to give out. (R. 44). Claimant also uses a cane to help him walk about twice a week. *Id.* The cane was not prescribed, but Claimant uses it when he is experiencing tingling and numbness in his feet. *Id.*

Claimant still has a current driver's license, and can drive for about an hour before he has to stop and rest. *Id.* Claimant can walk or stand for 30 minutes before having to stop and rest because of his back pain. (R. 37-38, 42-43). Because of his arthritis, Claimant has weakness in his arms. (R. 38). He can lift 30 to 35 pounds with his arms. *Id.* Claimant is able to lift his arms slightly over his head, with pain. (R. 45). Claimant can extend his arms beyond shoulder level, but it hurts to hold his arms in that position. *Id.* Claimant is not able to lift objects over his head, regardless of their weight. *Id.* Claimant takes care of the yard work at his house by cutting the grass. (R. 38).

On an average day, Claimant gets up around 10:00 a.m., gets dressed, goes to get coffee, and watches television, sometimes taking a trip to Walmart. (R. 38-39).

On July 9, 2011, Claimant went to the emergency room at the VA after pulling a muscle in the left side of his back two days earlier. (R. 45-47). Claimant was alone and had a flat tire, and pulled a muscle in his back when he tripped over the spare tire that was lying on the ground while trying to change his flat tire. (R. 46-47). Claimant had not attempted to do any work like that before that day, and there was no one around that could have helped him. *Id.*

## C. Vocational Expert's Testimony at the Administrative Hearing

William Stewart testified as a VE at the administrative hearing. (R. 47-56). After the VE's testimony regarding Claimant's past work experience (R. 48-49), the ALJ asked the VE to assume a hypothetical individual of the same age, education, and prior work experience as Claimant and posed three hypothetical questions. (R. 49-52). First, the ALJ asked whether the individual could perform Claimant's past relevant work assuming the individual is "limited to lifting and carrying 30 pounds occasionally and frequently and no forceful pushing and pulling, bilateral upper extremities, no other limitations." (R. 49). The VE responded that there would be a number of forklift operator jobs, some night supervisor jobs, and some truck driving jobs that would fit that description, but that the hypothetical individual would not be able to work as a merchandiser. *Id.* Next, the ALJ asked the VE if there were any other jobs that such an individual could perform. *Id.* The VE stated that the individual could work as a medium level bench hand worker (DOT # 706.381-014), shipping and receiving clerk (DOT # 222.387-050), and stocker or stock clerk (DOT # 299.367-014). (R. 49-50).

The ALJ then asked the VE if there were any unskilled jobs that the hypothetical individual could perform, and reminded the VE to provide the numbers of positions in the national and local

7

economies. (R. 50). The VE responded that the individual could work as a packer (DOT # 920.587-018), bench hand sorter (DOT # 760.587-014), and filling machine operator (DOT # 920.685-078). *Id.*

In the second hypothetical, the ALJ asked whether the individual could perform Claimant's past relevant work assuming the individual is "limited to medium exertion, could lift 50 pounds occasionally, 25 pounds frequently, limited to simple, repetitive tasks or unskilled work with occasional interpersonal contact incidental to the work and very routine in nature with little change." (R. 50-51). The VE responded that such an individual could not perform Claimant's past relevant work, but in response to the ALJ's question, noted that there are other jobs the individual could perform, such as an assembler (DOT # 706.687-010), cleaner (DOT # 381.687-018), and laundry worker (DOT # 361.684-014). (R. 51). In the third hypothetical, the ALJ asked the VE whether the first hypothetical individual could perform Claimant's past relevant work with the added limitation of simple, repetitive tasks that are routine in nature with occasional interpersonal contact incidental to work. (R. 51-52). The VE responded in the negative, but indicated that the three identified unskilled jobs of packer, bench hand sorter, and filling machine operator would not be affected by these additional limitations. (R. 52).

In response to questioning by Claimant's counsel, the VE testified that the individual from the third hypothetical would not be able to perform any of the identified jobs if the individual was limited to "only occasional reaching in all directions, no bending, stooping, crouching, or crawling and only able to stand for 30 minutes at a time without having to sit for a period of time, basically changing positions every 25 to 35 minutes." (R. 52-53). Claimant's counsel clarified that the VE had considered Claimant's past relevant work as a forklift operator, night supervisor, and truck driver

8

as component tasks within his position as a truck driver manager. (R. 53).

Claimant's counsel then asked whether the VE had accounted for the ALJ's 30-pound maximum weight limit in responding to the first hypothetical, as the identified jobs were all medium level exertion positions. *Id.* The VE responded that the hypothetical worker would be functioning in a limited category of medium work (with the 30-pound weight restriction), as opposed to the full range of medium work. (R. 54). Claimant's counsel then asked how the VE was supporting the weight requirements for each identified job and the frequency of those positions. *Id.* The VE responded that, according to the DOT, medium work means that an individual does not lift more than 50 pounds. *Id.* The VE's responses, taking into account this weight limitation, were based on his "40 years of working with individuals with disabilities and evaluating them . . . for past work, for other kinds of jobs, and knowing what it takes to perform a job in terms of my professional experience, not just relying on the DOT." (R. 55).

## V. DISCUSSION

### A. The ALJ's failure to classify Claimant's knee condition as a severe impairment is not reversible error.

Claimant argues that the ALJ erred at step two of the sequential evaluation process because "he did not even consider" whether Claimant's knee impairment was severe and "failed to rectify this error" in the RFC determination. Pl.'s Mem. at 4-7.

At step two, the ALJ must determine if the claimant has one or more severe medically determinable impairments. 20 C.F.R. § 404.1520(a)(4)(ii). However, if an ALJ fails to consider whether a specific impairment is severe at step two, it is not necessarily reversible error. As long as a claimant has any severe impairment or combination of impairments, the ALJ must proceed

9

beyond step two and consider all of the impairments (including non-severe impairments) at the remaining steps, which in this case, was done. 20 C.F.R. § 404.1545(a)(2); *see Jones v. Astrue*, No. 5:07-CV-452-FL, 2009 WL 455414, at *2 (E.D.N.C. Feb. 23, 2009) (finding no reversible error where an ALJ does not consider whether an impairment is severe at step two, provided the ALJ considers the impairment in subsequent steps).

In this case, the ALJ determined that Claimant satisfied the severity requirement at step two by finding that Claimant's back injury constituted a "severe" impairment. (R. 16-17). Moreover, the ALJ classified Claimant's knee impairment as "not severe" later in the sequential process and gave specific reasons for that determination:

> The claimant is also alleging disability due to knee and shoulder pain and he testified that he wears a knee brace that was prescribed by a VA doctor and uses a cane that he purchased himself. . . . In regard to the claimant's knee the record shows that in August 2010 Dr. Kishbaugh found no weakness in the lower extremities during an examination. In November 2010 the claimant was seen in the ER complaining of hip pain at which time it was noted that he was wearing a brace on his knee but without any indication that the brace was required or had been prescribed by a physician. In February 2011 a VA treatment note indicated that the claimant had a mildly antalgic gait secondary to knee pain but an x-ray of the knee in May 2011 revealed only mild osteoarthritis. I also note[] that just three months before the hearing, during which he stated that he was wearing a knee brace and was using a cane, he had been changing a tire, an activity incompatible with someone who is in significant pain, whose knee is in a brace and who needs a cane to ambulate. Moreover, during an examination by Dr. Kishbaugh in May 2010 the claimant's gait was described as normal and he was able to perform a single leg stance, toe press up and heel rock without difficulty. *Thus, there is little evidence that documents that the claimant has any significant knee problems and I therefore find that the claimant's knee allegations are not severe.*

(R. 23) (emphasis added). Therefore, the ALJ explicitly assessed the severity of Claimant's knee impairment and provided adequate reasons for this finding. *Id.*

Furthermore, in addition to the evidence cited by the ALJ, Claimant's work history and

10

activity level support the ALJ's finding that Claimant's knee impairment is not severe. On April 19, 2007, almost three years prior to the alleged onset date, Claimant underwent a left knee arthroscopy and debridement of his left lateral meniscus. (R. 520-22). Claimant worked as a merchandiser from 2006 until March 2010 when he suffered a back injury at work. (R. 151, 186, 306). At the hearing, the VE testified that Claimant's job as a merchandiser during this period was "medium" work with an "SVP of 5, which is the full range of semi-skilled activity." (R. 48). Claimant testified that this job required driving pallets of products weighing 40 to 50 pounds to stores, unloading and lifting the products at stores, and building large displays for the products. (R. 39). Claimant further testified that "[t]here's a lot of physical work with your hands and you wear out your legs . . . ." *Id.* Accordingly, Claimant's ability to perform this level of work activity from 2006 until March 2010, despite his allegedly severe knee impairment, and the record of his active lifestyle and extensive functional abilities,[2] are substantial evidence supporting the ALJ's determination that Claimant's knee impairment is not severe. (R. 37-39, 201, 204-207, 278, 309, 395, 410, 411, 432).

Next, Claimant argues that the ALJ "failed to rectify" his error of not classifying Claimant's knee impairment as severe at step two by not considering Claimant's knee impairment in the RFC determination. Pl.'s Mem. at 4. It is apparent from the ALJ's decision that he considered Claimant's knee impairment in the RFC determination. Specifically, the ALJ discussed: Claimant's testimony

---

[2] For example, Claimant testified at the administrative hearing that he can drive an hour before he needs to stop and rest (R. 37), walk 30 minutes at a time (R. 38), lift up to 35 pounds with his arms (R. 38), and cut the grass at his home. (R. 37-38). In July 2010, Claimant completed a functional report indicating he is able to take care of his personal needs, exercise, "drive around town," cook and prepare his meals daily, perform repairs, go outside everyday, go out alone, buy clothes and tools in stores, go fishing, spend time with others in person and over the telephone, go to community stores, and follow spoken instructions well. (R. 201-07). Additionally, when responding to a question asking what he was able to do before his condition that he cannot do anymore, Claimant responded "don't know." (R. 203). Claimant also noted that his condition slows him down "when trying to fish." (R. 206). In August 2010, Claimant told Dr. Edward Crane, a consultative examiner, that he cuts other people's grass and picks up some scrap for odd jobs to make money. (R. 410).

11

concerning his knee brace (R. 18, 23, 43-44), treatment notes regarding his knee brace (R. 19-20, 22, 409, 432), his history of knee surgery (R. 20, 432), his physical therapist's notes concerning his knee (R. 23-24, 469), his knee X-rays (R. 20, 462-463), his VA disability rating of his knee (R. 21-22, 533-534), the lack of medical evidence supporting a "severe" knee impairment (R. 21), and medical tests indicating Claimant was not experiencing any functional loss due to his knees (R. 21, 23-24, 324, 406, 452, 462-463, 472). The fact that Claimant does not agree with the degree of functional limitation ascribed by the ALJ to the knee impairment does not mean the ALJ failed to consider it.

Finally, Claimant argues the ALJ failed to acknowledge that Claimant underwent surgery for his "internally deranged left knee in April of 2007," that Claimant "continued to receive treatment for significant left knee pain and stiffness since that time and it has affected his gait," and that Claimant's "objective pathologies have resulted in an inability to walk or stand for more than 30 minutes each." Pl.'s Mem. at 5 (citing R. 38, 287, 462-63, 469). While the regulations require the ALJ to consider all evidence in the record when making a disability determination, 20 C.F.R. § 404.1520(a)(3), the ALJ is not required to discuss every piece of evidence. *McLamb v. Astrue*, No. 5:08-CV-305-FL, 2009 WL 2046062, at *2 (E.D.N.C. July 14, 2009) (citations omitted). Rather, the ALJ's opinion must contain "sufficient reasons for all material findings of fact and conclusions of law that the reviewing court can discern what the ALJ did and why he did it." *Redmond v. Astrue*, No. 4:08-CV-14-FL, 2009 WL 863587, at *3 (E.D.N.C. Mar. 24, 2009) (citations omitted). Here, the ALJ's thorough discussion, as noted above, provides sufficient reasons for his assessment regarding the severity of Claimant's knee impairment. (R. 18-23). Moreover, the ALJ specifically acknowledged Claimant's history of surgery on his knee (R. 20) and discussed other medical records related to Claimant's knee impairment (R. 18-24).

12

Accordingly, the ALJ did not err in failing to classify Claimant's knee impairment as "severe" at step two, where the ALJ subsequently considered Claimant's knee impairment in formulating the RFC and the determination is supported by substantial evidence.

**B.     The ALJ's evaluation of Claimant's VA disability ratings is not reversible error.**

Claimant argues that the ALJ improperly evaluated his VA disability ratings. Pl.'s Mem. at 5. Specifically, Claimant asserts that the ALJ erred in rejecting the VA ratings as irrelevant to the determination of disability and in failing to consider how the VA decisions "shed light" on Claimant's knee impairment. *Id.* Claimant cites *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 343 (4th Cir. 2012), for his contention that the ALJ was required to give the VA disability ratings substantial weight.

The VA assigned Claimant a 0% disability rating from July 1998 through April 19, 2007, the date of his left knee arthroscopy and debridement of his left lateral meniscus. (R. 520-22). Following recovery from this procedure, the VA assigned Claimant a 10% disability rating as of June 1, 2007. *Id.* As of February 25, 2008, the VA raised Claimant's 10% disability rating to 20%. (R. 525-34). No further adjustments were made to Claimant's VA disability rating for his left knee impairment after February 2008 (almost two years prior to his alleged onset date).

Although not binding on the Commissioner, disability decisions by other governmental agencies "cannot be ignored and must be considered" in making a disability determination. SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006). In *Bird*, the Fourth Circuit noted that "both the VA and Social Security programs serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability." *Bird*, 699 F.3d at 343 (citation omitted). "Thus, . . . in making a disability determination, the SSA must give substantial weight to a VA disability

13

rating" unless the record clearly demonstrates that a lesser weight is appropriate. *Id.* In certain cases, deviation may be appropriate due to the different standards employed by the agencies in evaluating a claimant's disability. *Id.* ("[B]ecause the SSA employs its own standards for evaluating a claimant's alleged disability . . . an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.").

This is not a case where the ALJ failed to mention or to explain the consideration given another agency's disability decision. *See, e.g., Allen v. Colvin,* No. 2:12-CV-29-FL, 2013 WL 3983984, at *2 (E.D.N.C. Aug. 1, 2013) (remanding case where Commissioner did not indicate weight given to Medicaid determination). Rather, the ALJ carefully considered the VA disability ratings and found that lesser weight should be accorded the ratings in Claimant's case:

> The claimant is alleging disability since March 2010 due primarily to a back injury but also knee pain, shoulder pain and depression. The undersigned first would like to address the issue of the claimant['s] . . . partial disability rating assigned by the VA. . . . The VA [] employs a partial disability rating and in this particular case has given the claimant a 20% partial disability rating due to his back impairment and a 20% partial disability rating due to degenerative arthritis, which I assume pertains to the claimant's knee. Neither of these ratings bear much relevance to a determination of disability under Social Security as the Social Security Act defines disability as the inability to engage in any substantial gainful activity due to an impairment or impairments that either are expected to result in death or that has lasted or is expected to last for a continuous period of at least 12 months. As such, . . . the VA partial disability rating cannot be used as a measure of disability under the Social Security Act but can be employed, along with other objective findings, to assess the degree of limitations, if any, in making a determination whether the claimant is capable of returning to his past work or is capable of performing other work that exists in the national economy.

(R. 21). When discussing Claimant's alleged limitations due to pain, the ALJ further discussed Claimant's disability rating for his knee impairment:

> The most recent note from the VA was on September 11, 2011 when the claimant was treated for tooth complaints. However, he also rated his back pain as a 9 at that time, even though on examination the claimant was reported in no acute distress and

14

> range of motion was reported to be normal. In reviewing these reports the lack of positive findings is generally consistent throughout the record and I am at a loss as to how the VA could have arrived at even a partial disability rating of 20% for the claimant's back or any rating for his knee. I note the disconnect between the claimant's reported pain levels and his demeanor. On most occasions the claimant rated his level of pain as an 8 or 9 on a scale of 1-10. On such a scale 1 is characterized as little or no pain while a 10 is considered to be the worst pain one could imagine. As such it is difficult to believe that the claimant's level of pain throughout this time has been at an 8-9 while at the same time he has often exhibited no pain behaviors and generally appeared calm and in no distress during examinations. I thus conclude that the claimant has exaggerated his level of pain.

(R. 22). Additionally, the ALJ addressed Claimant's 20% VA disability rating at least two different times when reviewing the medical evidence: first, noting that on August 30, 2011, Claimant was seen at the VA indicating that his level of pain was 9 of 10, however he "arrived at the VA by walking" and was "calm and fully oriented" (R. 20, 22, 448-49); and next, citing a medical record recognizing Claimant's VA disability rating but emphasizing that, upon physical examination in August 2010, Dr. Kishbaugh found Claimant's straight leg raising was negative, reflexes were normal, and there was no weakness in his lower extremities (R. 23, 406-07). Thus, unlike in *Bird*, the ALJ gives several reasons for discounting the weight given to the VA disability ratings. (R. 20-23).

Furthermore, the ALJ's disability determination was not based on the exact same evidence as was in front of the ALJ, as was the case in *Bird*. Rather, the ALJ's disability determination was based on over three years of medical evidence that the VA did not consider, as the last VA disability rating adjustment occurred on June 4, 2008. (R. 525-29). Thus, in the present case, the VA rating decisions are less relevant to the ALJ's determination than in *Bird*. Accordingly, the ALJ's decision to deviate from the VA disability rating is supported by substantial evidence in the record and was reached upon proper application of the law. Claimant's argument that the ALJ erred by failing to

15

give the VA decision substantial weight should, therefore, be rejected.

C.     **The ALJ's assessment of Claimant's credibility is supported by substantial evidence.**

Claimant contends that the ALJ improperly assessed Claimant's credibility. Pl.'s Mem. at 4. First, Claimant argues that the ALJ erred by making findings inconsistent with Claimant's testimony that he has chronic knee pain and that his left knee occasionally gives way when walking. *Id.* Second, Claimant asserts that the ALJ erred to the extent he relied on inaccurate findings–that Claimant's knee brace was not prescribed and that Claimant had not undergone surgery on his knee–to conclude Claimant's knee impairment was not significant and his complaints were less than credible. *Id.*

It is within the province of the ALJ to determine a claimant's credibility. *See Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) ("Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."). Federal regulation 20 C.F.R. § 404.1529(a) provides the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 593-94. First, the ALJ must objectively determine whether the claimant has medically documented impairments that could cause his or her alleged symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Hines v. Barnhart*, 453 F.3d 559, 564 (4th Cir. 2006). If the ALJ makes this first determination, he must then evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work," *Craig*, 76 F.3d at 595, and whether the claimant's statements are supported by the objective medical record. SSR 96-7p, 1996 WL 374186, at *2; *Hines*, 453 F.3d at 564-65. Objective medical evidence may not capture the full

16

extent of a claimant's symptoms, so where the objective medical evidence and subjective complaints are at odds, the ALJ should consider all factors "concerning the individual's functional limitations and restrictions due to pain and other symptoms." SSR 96-7p, 1996 WL 374186, at *3 (showing the complete list of factors). The ALJ may not discredit a claimant solely because his or her subjective complaints are not supported by objective medical evidence. *Craig*, 76 F.3d at 595-96. But neither is the ALJ required to accept the claimant's statements at face value–he "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *3; *see also Taylor v. Astrue*, No. 5:10-CV-263-FL, 2011 WL 1599679, at *4-8 (E.D.N.C. Mar. 23, 2011) (memorandum and recommendation finding the ALJ properly considered the entire case record to determine that Claimant's subjective complaints of pain were not entirely credible), *adopted by* 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011).

Here, the ALJ found that Claimant had medically determinable impairments reasonably capable of causing some of Claimant's subjective symptoms, but concluded Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the RFC assessment. (R. 21). The ALJ thoroughly explained the reasons for discounting Claimant's testimony and extensively analyzed the Claimant's testimony, treatment notes, test results, and medical opinion evidence over the course of more than three pages in his decision. (R. 21-24).

The ALJ specifically noted, among other things, that "the objective findings, which include diagnostic studies as well as the results of physical examinations, have not demonstrated any severe back, knee or other musculoskeletal pathology," citing Dr. Kishbaugh's May 25, 2010 consultative notes finding on examination good range of motion of the lumbar spine, although the claimant

17

reported pain on extension; negative straight leg raising and normal range of motion of all peripheral joints, including his knees; normal muscle strength, although there was give-away weakness in the right lower extremity; and Claimant was able to perform a single leg stance, toe press up and heel rock without difficulty and exhibited normal gait. (R. 18, 323-25). The ALJ observed that "[d]espite these less than dramatic findings and Dr. Kishbaugh's comment that the claimant appeared in no distress, during this examination the claimant rated his pain level as an 8 on a scale of 1-10." (R. 22). The ALJ further described other such instances where the ALJ perceived Claimant to be exaggerating his pain (R. 20-22). The ALJ noted that during a consultative psychological evaluation in August 2010, Dr. Crane found Claimant to be at best minimally cooperative, evasive, tended to exaggerate his symptoms and gave responses that strongly suggested that he was malingering (R. 409-12), citing this as additional evidence that Claimant "has exaggerated his physical complaints for secondary gain." (R. 23).

The ALJ considered both objective and subjective evidence in assessing Claimant's credibility, and the reasons cited by the ALJ in finding Claimant less than credible constitute substantial evidence to support the credibility determination. "Where the ALJ's determination of credibility is supported by such substantial evidence in the record, and where the ALJ had the opportunity to observe the demeanor of plaintiff in [his] testimony, it is not the province of the court to reweigh the evidence bearing upon credibility." *Melvin v. Astrue*, No. 7:11-CV-131-FL, 2012 WL 4447607, at *3 (citing *Mickles v. Shalala*, 29 F.3d 918, 929 (4th Cir. 1994) (Luttig, J., concurring); *Shively*, 739 F.2d at 990)).

Next, Claimant asserts the ALJ's finding that Claimant's knee brace was not prescribed is contradicted by the record. Pl.'s Mem. at 4. The ALJ noted that in November 2010, "claimant was

18

seen in the ER complaining of hip pain at which time it was noted that he was wearing a brace on his knee but without any indication that the brace was required or had been prescribed by a physician." (R. 23). Claimant argues that the VA determination contradicts this finding, where Claimant was "noted to need his postsurgical <u>knee brace</u> at times to prevent giving way." Pl.'s Mem. at 4 (emphasis added) (citing (R. 531)). In fact, the VA determination does not state as much, but rather indicates that Claimant uses a knee brace "intermittently" and that there is "no deformity or giving way."[3] (R. 531). Thus, the evidence cited by Claimant is not inconsistent with the ALJ's observation that there was no indication in the medical records that the brace was prescribed.

Finally, Claimant cites a portion of the ALJ's decision for the proposition that the ALJ discounted Claimant's testimony, in part, on the erroneous belief that he had not undergone surgery on his knee. Pl.'s Mem. at 4. Claimant relies on the following statement by the ALJ for this argument: "the August 2010 examination by Dr. Kishbaugh concluded by stating the claimant would remain off work pending a neurosurgical evaluation and possible surgical intervention. There is no evidence that the claimant ever underwent a neurosurgical evaluation nor is there evidence that any physician has recommended surgery." (R. 24). A review of the ALJ's discussion and the treatment notes of Dr. Kishbaugh indicate that these statements regarding surgery pertain to Claimant's lower back and disc bulge and not the aforementioned knee surgery. (R. 23-24, 406-07). Moreover, as stated above, the ALJ acknowledged Claimant's knee surgery in the decision. (R. 20).

In sum, the ALJ's reasons for finding Claimant's testimony not credible and his analysis of factors, where the medical evidence and Claimant's subjective complaints are not in accord,

---

[3] It is also noteworthy that while Claimant testified he required a brace on his left knee (R. 44) and the VA determination cited by Claimant pertains to his left knee disability rating (R. 531), other records indicate Claimant wore the brace on his right knee (R. 409, 432).

19

constitute an appropriate and complete consideration of Claimant's credibility. Further, substantial evidence supports the ALJ's determination that Claimant is not as functionally limited as he claims. Accordingly, the ALJ did not err in his credibility determination.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-24] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-27] be ALLOWED and the final decision of the Commissioner be UPHELD.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections, and responses thereto (if any) shall be filed within seven (7) days of receipt of the objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

Submitted, this the 29th day of August, 2014.

Robert B. Jones, Jr.
United States Magistrate Judge